Opinion issued October 16, 2003
     














In The
Court of Appeals
For The
First District of Texas




NO. 01-02-01330-CV




KOLL REAL ESTATE GROUP, INC., Appellant

V.

RAY E. PURSELEY; JOY BAER WARREN AND RONNIE BAER,
INDIVIDUALLY, AND AS HEIRS OF THE ESTATE OF GEORGE BAER,
JR.; HERMAN FANNIN; MARVIN HULSMAN; MARVIN JACKSON;
BERNARD V. KUKKUCK; LAWRENCE C. ROBERSON; LARRY
SCARBOROUGH; ANNA B. SUTTON, INDIVIDUALLY, AND AS
REPRESENTATIVE OF THE ESTATE OF CHARLIE C. SUTTON, AND
HARRELL SUTTON, DONALD RAY SUTTON, INDIVIDUALLY, AND AS
HEIRS OF THE ESTATE OF CHARLIE C. SUTTON; JOHNNY VISSAGE,
INDIVIDUALLY, AND AS REPRESENTATIVE OF THE ESTATE OF
WILLIAM W. VISSAGE, AND VERNELLE VISSAGE, CINDY BOGGS,
AND RITA DAVIS, INDIVIDUALLY AND AS HEIRS OF WILLIAM W.
VISSAGE; AND MERTA WHITFIELD, AS NEXT FRIEND OF CHARLES
WHITFIELD’S WRONGFUL DEATH BENEFICIARIES, TROY ROSALES
AND CHARLEY ROSALES, MINOR CHILDREN, Appellees




On Appeal from the 10th District Court
Galveston County, Texas
Trial Court Cause No. 02-CV-0976




O P I N I O N 
          These case is an interlocutory, accelerated appeal from the trial court’s denial
of a special appearance filed by appellant, Koll Real Estate Group, Inc. (Koll). See
Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (Vernon 2001). The issue we
must decide is whether, by accepting an assignment of rights and liabilities under a
purchase agreement, and agreeing to indemnify the purchaser for tort damages, some
of which allegedly occurred in Texas, Koll has become amenable to suit in Texas,
despite its own lack of minimum contacts thereto.
BACKGROUNDA. Procedural Background
          The underlying actions are asbestos suits brought by several workers or their
survivors (the asbestos plaintiffs) against 65 companies, alleging asbestos exposure. 
The asbestos plaintiffs do not allege that their injuries were caused by appellant, Koll
Real Estate Group, Inc. (“Koll”). Instead, they allege that their injuries were caused
by the M.W. Kellogg Company (“Kellogg”), and that Koll is liable as a contractual
“successor-in-interest” to Kellogg. After the suit was brought, Koll filed a special
appearance, arguing that it is not subject to personal jurisdiction in Texas. The
parties presented their evidence by affidavit, and the trial court denied Koll’s special
appearance. Koll then filed this interlocutory appeal. 
B. The Corporate Evolution of Koll
          Pullman, Inc. (Pullman) was created in June 1927 and was acquired in
November 1980, by Wheelabrator-Frye, Inc. (WFI). In 1981, WFI spun off Pullman’s
transportation and railcar businesses into separate companies, while retaining its
M.W. Kellogg engineering business (previously an unincorporated division of
Pullman), and changed Pullman’s name to The M.W. Kellogg Company (Kellogg). 
In 1983, WFI became a wholly-owned subsidiary of the Signal Companies, Inc. In
1985, Signal merged with Allied Corporation and became a wholly-owned subsidiary
of Allied-Signal, Inc.
          In early 1986, Allied-Signal divested 39 of its businesses through the formation
and spin-off of a new corporation called The Henley Group, Inc. (Henley I), which
included Kellogg as a corporate subsidiary. 
          1. The Purchase Agreement between Henley I/Kellogg and Dresser
          On January 11, 1988, Henley I and Kellogg sold Kellogg’s engineering
business and assets to Dresser Industries. As a part of the Purchase Agreement,
Henley I agreed to “defend, indemnify and hold Dresser and each Kellogg Company
harmless against any claim, action, loss, cost, expense, liability, penalty or interest or
damage . . . relating to . . . any Closed Contract or Job.”
          2. The Creation of Henley II
          Near the time of the sale of portions of Kellogg to Dresser, Henley I completed
a reverse spin-off, in which it placed certain assets and businesses into a wholly-owned subsidiary of Henley I, formerly called Henley Newco, Inc., and now renamed
The Henley Group (Henley II), and all of the shares were then given to shareholders
as a dividend. All the Kellogg stock remained with Henley I, and Kellogg remained
a subsidiary of Henley I. 
                    a. The Assignment of the Dresser Contract
          However, as part of the reverse spin-off, Henley I assigned certain assets to
Henley II, including a purchase agreement with Dresser (“the Dresser Contract”). 
Henley II assumed all of Henley I’s rights and liabilities under the assigned Dresser
Contract. Dresser signed the “Assignment, Assumption and Release Agreement,”
thereby signifying its agreement to look to Henley II for performance of Henley I’s
obligations under the Dresser Contract.
          As a result of the “Assignment, Assumption and Release Agreement,” Henley
II owned the right to receive payment from Dresser, but also inherited Henley I’s
obligation to indemnify Dresser from liabilities arising from closed contracts.
                    b. The Transition Agreement
          As part of the spin-off of Henley II, Henley I and Henley II entered into a
transition agreement in December 1988. Under this agreement, Henley I and II
exchanged indemnity agreements, whereby each company promised that it would
indemnify the other against those liabilities arising out of its own failure to “pay,
perform or otherwise discharge in due course any of [its own obligations].” As stated
earlier, Henley II had received the Dresser Contract as an asset in the division
between Henley I and Henley II; thus, the effect of the transition agreement was that
Henley II promised to indemnify Henley I if Henley II failed to perform its
obligations under the Dresser Contract.
          3. The Emergence of Koll
          During the course of several years, Henley II underwent several name changes
and eventually became Koll Real Estate Group, Inc. Kellogg also underwent several
name changes since 1988, and eventually merged into Resco Holdings, Inc. Resco
Holdings, Inc. remains a subsidiary of Henley I.



C. Summary of Relevant Facts
          As stated in appellees’ brief, “Corporate name changes, mergers, acquisitions,
spin-off and reverse spin-offs weave such a tangled story in this case they almost
obscure the simple facts of liability and jurisdiction.” Thus, the most important facts
are these:
          Plaintiffs were allegedly injured by Kellogg. Kellogg, today known as Resco
Industries, is a subsidiary of Henley I. Henley I sold a portion of Kellogg’s business
to Dresser in 1988. As a part of that sale, Henley I became obligated to indemnify
Dresser for liability arising from Kellogg’s closed jobs, including, presumably the tort
liability alleged by the asbestos plaintiffs, which occurred in Texas.
          In 1988, with Dresser’s consent and approval, Henley I transferred all of its
rights and liabilities under the Dresser Contract to Henley II, including, presumably,
its responsibility to indemnify Dresser for liabilities arising out of closed jobs. 
However, Kellogg remained at all times a subsidiary of Henley I.
          Henley I is now known as Wheelabrator Group, Inc., and Kellogg, its
subsidiary, is now known as Resco. Henley II is now known as Koll.
STANDARD OF REVIEW
          The plaintiff bears the initial burden of pleading sufficient allegations to bring
a nonresident defendant within the provisions of the long-arm statute. BMC Software
Belgium, N.V. v. Marchand, 83 S.W.3d 789, 793 (Tex. 2002); see McKanna v. Edgar,
388 S.W.2d 927, 930 (Tex. 1965). A defendant challenging a Texas court’s personal
jurisdiction over it must negate all jurisdictional bases. BMC Software, 83 S.W.3d
at 793; Kawasaki Steel Corp. v. Middleton, 699 S.W.2d 199, 203 (Tex. 1985). 
Whether a court has personal jurisdiction over a defendant is a question of law. BMC
Software, 83 S.W.3d at 794; see Hotel Partners v. Craig, 993 S.W.2d 116, 120 (Tex.
App.—Dallas 1994, writ denied). However, the trial court frequently must resolve
questions of fact before deciding the jurisdiction question. BMC Software, 83 S.W.3d
at 794. When, as here, a trial court does not issue findings of fact and conclusions of
law with its special appearance ruling, all facts necessary to support the judgment and
supported by the evidence are implied. Id.; see Worford v. Stamper, 801 S.W.2d 108,
109 (Tex. 1990); Zac Smith & Co. v. Otis Elevator Co., 734 S.W.2d 662, 666 (Tex.
1987).
PERSONAL JURISDICTION
          The Texas long-arm statute governs Texas courts’ exercise of jurisdiction over
nonresident defendants “doing business” in Texas. See Tex. Civ. Prac. & Rem.
Code Ann. §§ 17.041-.045 (Vernon Supp. 2003). The long-arm statute’s “doing
business” requirement is broad, and is limited only by the requirements of federal due
process guarantees. Schlobohm v. Schapiro, 784 S.W.2d 355, 357 (Tex. 1990). 
Therefore, when the exercise of personal jurisdiction comports with federal due
process limitations, requirements of the Texas long-arm statute are satisfied. 
Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223,
226 (Tex. 1991). With respect to personal jurisdiction, federal due process mandates
(1) that the nonresident have purposefully established “minimum contacts” with the
forum state; and (2) that the exercise of jurisdiction over the nonresident comport
with “traditional notions of fair play and substantial justice.” CSR, Ltd. v. Link, 925
S.W.2d 591, 594 (Tex. 1996) (orig. proceeding) (quoting Int’l Shoe Co. v.
Washington, 326 U.S. 310, 316, 66 S. Ct. 154, (quoting Milliken v. Meyer, 311 U.S.
457, 463, 61 S. Ct. 339, (1940))). A nonresident establishes minimum contacts in
Texas by purposefully availing itself of the privileges and benefits inherent in
conducting business within the state. CSR, Ltd., 925 S.W.2d at 594. Requiring
purposeful availment ensures that the nonresident’s connections derive from its own
purposeful conduct, and not the unilateral actions of the plaintiff or third parties. 
Guardian, 815 S.W.2d at 227-28. Personal jurisdiction, therefore, does not emerge
from the nonresident’s random, fortuitous, or attenuated contacts with the forum, or
from another’s acts. Id. at 226. Rather, the nonresident, itself, must take some action
or engage in some conduct creating its own “substantial connection” with the forum
state. Id. (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-72, 105 S. Ct.
2714 (1985)).
          It is undisputed in this case that Koll does not have sufficient minimum
contacts, itself, for Texas to assert jurisdiction over it. Rather, the asbestos plaintiffs
argue that the contacts of Kellogg should be imputed to Koll, because Koll’s
predecessor, Henley II, had promised to indemnify Dresser for liabilities arising from
Kellogg’s closed contracts, some of which took place in Texas.
          The asbestos plaintiffs admit that Koll is not the true corporate successor of
Kellogg; Resco is. They further admit that their claim of liability by Koll is not based
on article 5.10(B)(2) of the Texas Business Corporations Act, which statutorily
imposes successor liability on an acquiring corporation that expressly assumes
liabilities of a selling corporation. Instead, their assertion of jurisdiction over Koll
is based on the theory that “Koll is liable because its predecessor, [Henley II],
voluntarily assumed contractual liability for the acts for which suit is brought.”
          We disagree with the asbestos plaintiffs’ characterization of the record on this
point. Nowhere in the record does Koll assume “contractual liability” to third parties
for the torts allegedly committed by Kellogg in Texas. The record shows that, at
most, Koll received Henley II’s responsibility to indemnify Dresser for any liabilities
that Dresser suffered as a result of Kellogg’s closed contracts. Similarly, Koll may
have inherited Henley II’s responsibility to indemnify Henley I in the event that
Henley II failed to comply with the terms of the Dresser Contract.
          Thus, the issue we must decide is whether an agreement to indemnify another
for losses incurred in Texas, which a nonresident corporation acquires by assignment,
is a sufficient basis for asserting personal jurisdiction over the nonresident
corporation. We hold that, in this case, it is not.
A. The Indemnity Agreements Alone Are Not Sufficient “Minimum Contacts”
          Even if we assume that Koll, as corporate successor to Henley II, has a
contractual obligation to indemnify Dresser (pursuant to the Purchase Agreement) or
Henley I (pursuant to the Transition Agreement/Assignment), we do not believe that
such a contractual obligation, alone, is sufficient to support an assertion of personal
jurisdiction over Koll in this case. Our conclusion is supported by looking at other
personal jurisdiction cases in which the nonresident’s sole contact with the forum was
an agreement to indemnify another based on an event occurring in the forum.
          In Gessman v. Stephens, 51 S.W.3d 329, 333 (Tex. App.—Tyler 2001, no pet.),
the plaintiff was killed when the joystick on a tree-cutting machine malfunctioned. 
Id. The plaintiff’s survivors sued several manufacturers who produced components,
which were eventually incorporated into the tree-cutting machine, including
Gessman, a German company with no other contacts to Texas. Id. Gessman,
however, had agreed to indemnify one of the other defendants for all causes of action
concerning its products. Id. The plaintiff argued that the indemnification agreement
between Gessman and the other defendant was a sufficient basis for asserting
personal jurisdiction. Id. at 337 n.5. The court of appeals disagreed and stated as
follows:
We do not find the indemnification agreement at issue to be a substantial
connection between Gessman and the State of Texas. While an
indemnification agreement certainly contemplates the possibility of
litigation, it does not represent the sort of purposeful direction of
activities toward the forum state as contemplated by the Supreme Court
in [Asahi Metal Indus. Co., Ltd. v. Superior Court, 480 U.S. 102, 114,
107 S. Ct. 1026, 1033 (1987)].

Id. (internal citations omitted).
 
          In a similar case, the Texas Supreme Court has held that a foreign corporation,
whose only contact with Texas was an agreement to reinsure another foreign 
insurance company that, in turn, provided coverage to a Texas resident, did not have
sufficient minimum contacts with the State to support an assertion of personal
jurisdiction. See Malaysia British Assur. v. El Paso Reyco, Inc., 830 S.W.2d 919, 920
(Tex. 1992). In Malaysia British, the court noted that a reinsurance contract allows
only the reinsured company to bring a claim against the reinsurer, and the original
insured has no basis for a claim against the reinsurer. Id. The losses the reinsurer had
contractually agreed to cover were losses by the insurer, not the Texas insured. Id. 
We are persuaded that a reinsurance contract is sufficiently similar to an indemnity
agreement, such that the holding of Malaysia British should apply to this case. See
also Media Corp. of Am. v. Motif Manufacturing Co., 524 F. Supp. 86, 87 (S.D.N.Y.
1981) (“The rule in New York is clear that an indemnity agreement alone does not
provide a sufficient contact with New York simply because the underlying events that
trigger the indemnification occur in New York.”)
B. The Cause of Action Does Not Arise Out of The Indemnity Obligations
          Furthermore, even if we were to agree that the indemnity obligations were a
“minimum contact” with Texas, an assertion of jurisdiction over Koll based on that
contact would be inappropriate because the asbestos plaintiffs’ cause of action does
not arise out of that contact.
          A defendant’s minimum contacts with the forum state can produce either
general or specific jurisdiction. CSR, Ltd., 925 S.W.2d at 595. General jurisdiction
arising when a nonresident defendant’s contacts are “continuous and systematic,”
whereas specific jurisdiction is shown when the alleged liability “arises from or is
related to” a specific activity or contact within the forum. Id. A single contact with
Texas, of substantial quality and nature, may be sufficient to establish specific
jurisdiction when the cause of action arises from that contact. Mem’l Hosp. Sys., v. 
Fisher Ins. Agency, Inc., 835 S.W.2d 645, 650 (Tex. App.—Houston [14th Dist.]
1992, no writ).
          Both parties in this case appear to concede that Koll’s contacts with Texas are
insufficient to support general jurisdiction. Indeed, the asbestos plaintiffs’ entire
position hinges on the argument that the indemnity agreements referenced above give
rise to specific jurisdiction. Thus, we concern ourselves only with the issue of
specific jurisdiction.
          Koll argues that specific jurisdiction is inappropriate in this case because the
plaintiffs’ cause of action does not arise from the indemnity agreements between
Henley I, Henley II, and Dresser. We agree. The plaintiffs allege that they were
injured when they were exposed to asbestos by Kellogg, not that Koll has in any way
breached any duties it may or may not have under the indemnity agreements. While
Koll may, at some point in the future, owe Dresser or Henley I indemnity in the event
either of those companies are held liable for Kellogg’s torts, there is nothing in the
record to suggest that the asbestos plaintiffs were an intended beneficiary of these
agreements. Similarly, there is nothing to suggest that Koll should have anticipated
being haled into court by plaintiffs who were neither parties, nor third party
beneficiaries, to the indemnity agreements. Because the asbestos plaintiffs’ cause of
action is unrelated to the indemnity agreements, the plaintiffs cannot assert specific
jurisdiction over Koll based on those agreements.
CONCLUSION
          We sustain Koll’s single issue, reverse the order denying Koll’s special
appearance, and remand the case with instructions to dismiss the claims against Koll
for lack of personal jurisdiction.
 
 
 
Sherry Radack
                                                             Chief Justice

Panel consists of Chief Justice Radack and Justices Alcala and Higley.